AO 106 (Rev 04/10)  Application for a Search Warrant

AUSA Geraghty

# UNITED STATES DISTRICT COURT
### for the
### Southern District of Ohio

In the Matter of the Search of
*(Briefly describe the property to be searched
or identify the person by name and address)*
Safe Deposit Box #3 located in the 2475 South Hamilton Rd Columbus, Ohio
43232

)
)
)
)
)
)

Case No.  2:21-mj-780

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A to the Affidavit in Support of the Application, incorporated herein by reference.

located in the _____ Southern _____ District of _____ Ohio _____ , there is now concealed *(identify the person or describe the property to be seized):*

See Attachment B to the Affidavit in Support of the Application, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1956 (a)(1)(A)(i) | Laundering of monetary instruments |
| 21 U.S.C. § 841(a)(1) | possession with intent to distribute a controlled substance |
| 18 U.S.C. § 1956 (a)(1)(B)(i) | Laundering of monetary instruments with the intent to disguise the nature |
| 18 U.S.C. § 1343 | Wire Fraud |

The application is based on these facts:

See attached Affidavit.

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of ___ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Samuel Chappell ATF TFO
*Printed name and title*

Sworn to before me and signed in my presence.

Date:  12-7-21

City and state: Columbus, Ohio

_____
*Judge's signature*

US Magistrate Judge Chelsey M Vascura
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF: The safe deposit box #03 located in the 2475 South Hamilton Rd Columbus, Ohio 43232 | Case No. _____ <br> Under Seal |

**AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE**

I, **Samuel Chappell**, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.    I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the safe deposit box #3 located in the Chase Bank at 2475 South Hamilton Rd Columbus, Ohio 43232. Further described in Attachment A, for the things described in Attachment B.

2.    I am an "investigative or law enforcement officer of the United States" within the meaning of Section 2510(7) of Title 18, United States Code, that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Section 2516, Title 18, United States Code.

3.    I am a Columbus Ohio Police Officer (Columbus Police Department) currently assigned as a Task Force Officer (TFO) with the bureau of Alcohol Tobacco and Firearms (ATF). The Columbus Division of Police has employed me since 2007.  My responsibilities as a Task Force Officer include the investigation of violent criminal street gangs, narcotics traffickers, money launders, and firearm related crimes. I have participated in the execution of search warrants and arrests related to the above-referenced offenses. By virtue of my experience

and training, I am familiar with cellular telephone search warrants. Throughout this affidavit, reference to "investigators" specifically refers to criminal investigators.

4.     Based on my training and experience, I am familiar with the manner and means commonly employed by drug traffickers, including those employed to avoid detection by law enforcement.  I am also familiar with the terminology and slang commonly employed by drug traffickers.  In my training and experience, I have observed and examined cocaine, cocaine base ("crack"), heroin, marijuana, methamphetamine, oxycodone, heroin, fentanyl, and other controlled substances that are, by themselves, illegal to possess.  I am aware of the prices commonly charged on the street for these substances, the method of packaging, and the jargon used in their trade.  During my law enforcement career, I have received specialized training regarding the activities of narcotics traffickers, including the methods used to package, store, and distribute narcotics, and the methods used by narcotics traffickers to conceal and launder the proceeds of their narcotics trafficking activities.

5.     I have participated in various aspects of drug-related investigations.  I have participated in controlled purchases of controlled substances utilizing confidential sources and undercover law enforcement agents and officers.  I have prepared affidavits submitted in federal court in support of applications for criminal complaints, search warrants, tracking warrants, and/or arrest warrants.  I have participated in numerous investigations involving a variety of investigative techniques, including physical and electronic surveillance methods; controlled purchases; the analysis of a wide variety of records and data, including pen register and trap and trace data as well as cell phone location data; and the debriefing of defendants,

informants, and witnesses, as well as others who have knowledge of the distribution, transportation, storage, and importation of controlled substances.

6.     Through investigations, my training and experience, and conversations with other law enforcement officers, I have become familiar with the methods used by narcotics traffickers to distribute, transport, store, import, and safeguard controlled substances. I know that narcotics trafficking organizations have developed a number of methods to insulate their illegal activities from law enforcement detection. For instance, I know that members of narcotics trafficking organizations routinely utilize electronic communications facilities, including cellular telephones and mobile messaging applications such as Snapchat, to communicate operational directives and information concerning the conduct of the organization's illegal activities to other organization members; that organization members routinely use coded references in an effort to avoid law enforcement detection; and that the communication of time-sensitive information is critical to the successful conduct of these organizations' illegal activities. I am also familiar with narcotics traffickers' use of prepaid cellular and cellular phones, normal land line phones, public phones, debit calling cards, counter-surveillance, and the use of false and/or fictitious identities. Finally, I am familiar with the coded language used by narcotics traffickers during conversations in an attempt to disguise the true meaning of their conversations.

7.     This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter. I have not omitted any facts that would negate probable cause.

3

8.    Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of Title 18, United States Code, Sections 1956 (Money Laundering), 1343 (Wire Fraud), and Title 21, United States Code Section 841 Distribution of a Controlled Substance and have been committed by Deshawn LEWIS, Mario SYDNOR Sr., and others. There is also probable cause to search the safe deposit box described in Attachment A for evidence, instrumentalities, and/or fruits of these crimes, as further described in Attachment B.

## APPLICABLE STATUTES AND DEFINITIONS

9.    Title 18, United States Code, Section 1956 makes it a federal crime for any person, knowing that property involved in a financial transaction represents proceeds of unlawful activity, to conduct or attempt to conduct that financial transaction involving the proceeds of the unlawful activity, either A) with the intent to promote or carry on the unlawful activity or intent to violate section 7201 or 7206 of the Internal Revenue Code; or B) knowing that the transaction is designed to conceal or disguise the nature, location, source, ownership or control of the proceeds of the unlawful activity or to avoid a transaction reporting requirement under state or federal law.

10.    Title 18, United States Code, Section 1343 makes it a federal crime for any person having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or

4

foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice.

11.     Title 21, United States Code, Section 841 makes it a federal crime for any person to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute or dispense a controlled substance.  Subsection (b) of this section makes cocaine, cocaine base, heroin, N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propanamide, commonly referred to as fentanyl, and any of their isomers controlled substances.  Title 21, United States Code, Section 846, makes it a crime for any person to attempt or conspire to commit any offense defined in Section 841.

## BACKGROUND REGARDING ACTIVITIES OF DRUG TRAFFICKERS

12.     Your affiant has learned through training and experience the ways in which narcotics traffickers conduct their business, including methods of distributing narcotics, the use of home-based telephones and the use of cellular telephones, and the use of vehicles to facilitate their illegal activities. Your affiant's training and experience as a CPD detective and an ATF TFO form the basis of the opinions and conclusions set forth below.  Based on your affiant's training, experience, and the experience of other officers, detectives, and agents, your affiant is aware:

   a.    that narcotics traffickers often place assets in names other than their owner and/or use fictitious identification to avoid detection of these assets by government agencies or local law enforcement;

   b.    that even though these assets are in other persons' names the narcotics traffickers continue to exercise dominion and control;

5

c.   that narcotics traffickers must maintain and finance their ongoing narcotics activities, as well as for paying bills, acquiring assets, and making other purchases;

d.   that it is common for narcotics traffickers to maintain books, records, receipts, notes, ledgers, airline tickets, bus tickets, rental car receipts, receipts relating to the purchase of financial instruments and/or the transfer of funds, and other papers relating to the transportation, ordering, purchasing, processing, storage, sale and distribution of drugs, and the collection of its proceeds.  That the aforementioned books, records, receipts, notes, ledgers, etc., are maintained where the narcotics traffickers have ready access to them;

e.   that it is common for narcotics traffickers to secrete contraband, proceeds of drug sales, records of drug transactions, large amounts of currency, financial instruments, precious metals, jewelry, and other items of value; and evidence of financial transactions relating to obtaining, transferring, secreting, and spending large sums of money made from engaging in narcotics trafficking activities in secure locations within their residences and/or other locations over which they maintain dominion and control, in order to have ready access to them;

f.   that it is common for persons involved in narcotics trafficking to maintain evidence pertaining to their obtaining, secreting, transfer, concealment, and/or expenditure of narcotic proceeds, such as: currency, financial instruments, precious metals and gem stones, jewelry, books, records, invoices, receipts records of real estate transactions, bank statements and related records, passbooks, money drafts, letters of credit, loan records, money orders, bank drafts, cashier checks, bank checks, wire transfers, safe deposit box keys and money wrappers.  These items are maintained by the narcotics traffickers within their residences and/or other locations which they maintain dominion and control;

g.   that when drug traffickers amass a large amount of proceeds from the sale of drugs, the drug traffickers attempt to legitimize these profits;

h.   that to accomplish these goals, narcotics traffickers utilize, including, but not limited to, foreign and domestic banks and their attendant services, Western Union and other wire transfer or Money Service Businesses sales agents, check cashing services, real estate agents, securities brokers, accountants, attorneys, business fronts, and otherwise legitimate businesses which generate large quantities of currency;

i.   that narcotics traffickers often utilize electronic equipment such as currency counting machines, telephone answering machines, telephone caller identification boxes, and cellular telephones in their drug activities;

j.   that drug traffickers often take or cause to be taken photographs/video tapes of themselves, their associates, their property, and their products.  These traffickers usually maintain these photographs/video tapes in their residences and/or other locations in which they maintain dominion or control, including on electronic devices which are used to post such photographs/videos on social media or other websites or applications;

k.   that the sale of controlled dangerous substances, generates large quantities of United States currency (aka, street money);

l.   that is common for drug dealers to separate their "street money" by denomination and put this currency in rubber banded stacks in varying $1,000 increments to facilitate quick counting;

m.   that the Currency Transaction Report (CTR - IRS Form 4789), which is required to be completed and filed with the Internal Revenue Service by all financial institutions on every currency transaction which exceeds $10,000, causes tremendous problems for narcotics traffickers when they attempt to negotiate their illegal profits at a financial institution;

n.   that in order to evade the filing of a Currency Transaction Report (CTR), narcotics traffickers often "structure" their currency transactions so that no one transaction exceeds $10,000 or they provide false or misleading information in an attempt to legitimize or conceal the source and/or ownership of the currency;

o.   that narcotics traffickers commonly maintain addresses or telephone numbers in books or papers, which reflect names, addresses and/or telephone numbers of their suppliers, customers, and other associates involved in their narcotics trafficking organization;

p.   that drug traffickers commonly have in their possession, that is on their person, at their residences and/or other locations over which they maintain dominion and control, firearms, including but not limited to: handguns, pistols, revolvers, rifles, shotguns, machine guns, and other weapons. Said firearms are used to protect and secure a drug trafficker's property. Such property may include, but is not limited to: narcotics, jewelry, narcotics paraphernalia, books, records, and U.S. Currency; and

q.   that courts have recognized unexplained wealth is probative evidence of crimes, in particular, trafficking in narcotics.

7

## INVESTIGATION AND PROBABLE CAUSE

13.     This affidavit is submitted for the limited purpose of establishing probable cause and therefore contains only a summary of the relevant facts. I have not included each and every fact that I, or others, have learned during the course of this investigation.   The information set forth in this affidavit is based on my own participation in the investigation, information I have received from other law enforcement officials and from my other agents' analysis of documents and records relating to this investigation. As one of the case agents on this investigation, I am familiar with the investigative efforts of other agents/Columbus Police Detectives who have worked on this investigation.  Further, I am familiar with the evidence gathered through the issuance of search warrants, subpoenas, and information provided to myself and other agents by cooperating individuals.

14.     The United States, including the bureau of Alcohol Tobacco and Firearms (ATF) and the Columbus Division of Police (CPD) is conducting a criminal investigation of Deshawn LEWIS AKA "Crippy" and "Cripface" and his associates for violations of Title 18, United States Code, Section 1956 (a)(1)(A)(i) (Laundering of monetary instruments with the intent to promote the carrying on of the specified unlawful activity), Title 18, United States Code, Section 1956 (a)(1)(B)(i) (Laundering of monetary instruments with the intent to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of the specified

8

unlawful activity) Title 18, United States Code, Section 1343 (wire fraud), and Title 21, United States Code, Section, 841(a)(1) (possession with intent to distribute a controlled substance).

15.     As more fully established below, probable cause exists to believe that Deshawn LEWIS operates a Drug Trafficking Organization (DTO) which spans several states including Ohio and Texas. LEWIS operates his DTO with Mario "Big Rio" SYDNOR Sr., James Haley, Mario "Lil Rio" Sydnor Jr., Nashiba N. Radcliff, and others known and unknown to investigators. The investigation has shown that the LEWIS DTO traffics in fentanyl, methamphetamine, cocaine, and marijuana. Members of the DTO use the identities of drug users to rent homes and ship packages. The rental homes are used as locations from which to traffic narcotics. LEWIS and members of his DTO likely launder their drug proceeds through at least one bank account.

## CRIMINAL HISTORY

16.     LEWIS has felony arrests for narcotics and firearm possession. He has at least one felony conviction that could result in a sentence of more than one year in prison.

   a.  Franklin County Court of Common Pleas Case 04CR003007 for felony
       possession of drugs
   b.  Franklin County Court of Common Pleas Case 05CR000787 for carrying a
       concealed weapon.
   c.  Franklin County Court of Common Pleas Case 09CR001870 for carrying a
       concealed weapon.
   d.  Franklin County Court of Common Pleas Case 09CR003072 for felonious
       assault.

9

    e.   Franklin County Court of Common Pleas Case 09CR003587 for carrying a concealed weapon.

17.    LEWIS as his street name suggests is an associate and or member of the Crips criminal street gang. LEWIS is often observed with members and or associates of the Short North Posse (SNP) criminal street gang.

TIES TO CHASE BOX #3

18.    During the course of this investigation records pertaining to account activity of LEWIS were subpoenaed from Chase Bank where it was determined that LEWIS maintained a safe deposit box. LEWIS based upon photographs and his account activity deals in large amounts of cash which can easily be concealed in a safe deposit box for future narcotics dealings or for emergency situations.

19.    During November of 2020 investigators were aware of a rumor alleging that LEWIS's home had been burglarized and a large sum of United States Currency had been stolen. Investigators were able to later confirm that the burglary had occurred using messages recovered from LEWIS's iCloud account. On or about November 1, 2020, at approximately 10:27 p.m. a call was received by the Fairfield County Ohio Sheriff's Office reporting a burglary at 12472 Bentwood Farms Drive, Violet Township, Ohio. Once at scene deputies met with GRANT. GRANT stated that upon arriving home she found the rear glass door shattered. GRANT advised that a gun and possibly some jewelry were missing. No U.S. currency is listed on the burglary report. GRANT stated that she had left the home on October 31, 2020, at approximately 8:00 p.m. to visit an Airbnb, GRANT stated that she had a live-in boyfriend named LEWIS. GRANT called in at a later date to state the value of the jewelry was approximately $8,900.00. The

10

investigator at scene noticed several discrepancies from a normal burglary that lead them to believe that the suspect(s) were looking for something specific. These discrepancies included items of high value such as handbags, shoes, electronics and jewelry left at scene. Further the investigator noted that the areas that a normal burglar would not have looked at had been looked in like the air vents. The investigators also noted scales, zip lock baggies, money counter, and a shipping and postal scale in the home.

20.    On or about November 2, 2020, LEWIS sent a message stating, "somebody just hit my crib for a half a million". On the same day LEWIS sends messages to GRANT asking, "So do you got renter insurance", did they check the car", and "an see if it was a traccoing (tracking) device".  LEWIS in messages to a contact named "Jimloc" states he thinks it may have been someone named Rakim because one-time Rakim was at LEWIS's house and LEWIS had money out and showed Rakim that he hid it inside of an arcade game. Investigators believe that the robbery is what caused LEWIS to rent a safe deposit box. Investigators believe that LEWIS placed illicit narcotics proceeds into the safe deposit box # 3 at Chase Bank in order to keep it safe from rivals and law enforcement. Further investigators believe this money to be a fund for LEWIS to access if he is ever in need of money due to law enforcement or rivals' actions.

21.    Records from Chase Bank show that LEWIS rented safe deposit box #3 on or about November 6, 2020. The size of the box is 10X10. Investigators believe that it was not a coincidence that the box was rented a few days after the theft of a large amount of U.S. Currency from LEWIS. LEWIS then accessed the box twice on or about November 6, 2020, with his last access the box on or about November 20, 2020. Investigators believe that LEWIS placed a large

11

sum of U.S. Currency into the safe deposit box as an emergency fund and to keep it safe from being stolen or seized. It is not uncommon for narcotics dealers to store cash in safe deposit boxes for extended periods of time under their dominion and control as ready access funds.

### NARCOTICS TRAFFICKING

22.     On or about June 22, 2021, investigators interviewed a confidential source (hereafter referred to as CS1) about drug activity related to the west side of Columbus, Ohio. While speaking with CS1, officers obtained information about a drug house CS1 regularly purchases narcotics from. CS1 stated the drug house is located close to the corner of South Central Ave and Union Avenue. CS1 stated the house is one house south of the corner house and that everyone enters through the rear alley. CS1 stated you have to open a wooden gate and walk through the back yard, then go into the back door of the residence. CS1 further stated that there is a white guy who usually serves the drugs to the customers, but that they are not his drugs. CS1 stated the house is run by a black male who goes by the name of "Crippy" or "Cripface". CS1 stated you will never catch him there though because he is the boss. CS1 stated there is usually a group of black males who are armed that operate the house for him.

23.     Officers provided CS1 with a map to verify the exact location, which was verified as 430 South Central Avenue Columbus, OH 43223. CS1 stated that you can buy any type of drug from this house and that it is the busiest house in the area as far as drug related activity.

24.     After interviewing CS1, investigators began conducting surveillance of 430 South Central Avenue Columbus, OH 43223. Investigators were able to corroborate the information provided by CS1, along with additional evidence obtained through surveillance. LEWIS also was

12

observed and photographed by investigators on June 30th, 2021, at 430 South Central Avenue Columbus, OH 43223. LEWIS was observed opening the rear door of the residence for multiple individuals coming and going from the residence who were suspected of buying narcotics, corroborating information provided by the confidential informants.

25.    On July 1, 2021, a search warrant of 430 South Central Avenue resulted in the seizure of approximately 30 grams of crack cocaine, 19 grams of fentanyl, 1 handgun, $929 dollars in cash, and multiple items of drug paraphernalia. During the execution of the search warrant by Columbus Narcotics INTAC team, Mario Sydnor Jr. was found in the upstairs bathroom of the residence. Mario Sydnor Jr. was observed by tactical officers attempting to dispose of the recovered handgun, which he ultimately threw out the upstairs bathroom window onto the roof of the residence. Additionally, Mario Sydnor Jr's cell phone was recovered at the base of the bathroom toilet and the recovered narcotics were found floating in the bowl of the toilet. Almost the entirety of cash seized from the search warrant was located on the bathroom floor next to the toilet. Based on this evidence and observations made by the Narcotics tactical team, Mario Sydnor Jr. was placed under arrest.

26.    At the time of entry by Columbus INTAC Mario Sydnor Jr. was the only individual in the upstairs of the residence at the time. Nine additional individuals were detained by Columbus INTAC during the execution of the search warrant. All of the individuals were located in the basement of the residence, seven of the nine being local known street level prostitutes. These nine individuals were interviewed by investigators.

27. Several of these individuals found inside the residence CS2, 3, 4, 6, 7 identified Deshawn Lewis aka Crippy aka Cripface as the person who ran the drug house at 430 South Central Avenue.

28. Through law enforcement databases and social media investigators were able to identify Crippy/ Cripface as Deshawn LEWIS with a DOB: 4/12/1985 and SSN: XXX-XX-2067. Additionally, investigators learned that LEWIS to has an email ripmeefoo@gmail.com and a iCloud account of cripface4454@icloud.com. Investigators identified the Instagram account of 1_helluvanigga@instagram.com , the Facebook account of "Cutboy Crippy" as belonging to LEWIS.

` 29. A review of the iCloud account cripface4454@icloud.com provided multiple pieces of evidence allowing investigators to further understand LEWIS's DTO. Multiple videos and photos were observed on the iCloud where Deshawn LEWIS can be seen holding large sums of cash, jewelry, weapons, and suspected drugs. Based on training and experience, the amount of suspected drugs observed were far greater than any amount that would be possessed by a user and are indicative of a major drug trafficker. Many of the pictures and videos were geotagged to the location they were taken or received at. Paragraphs (29-43) document evidence located within the iCloud and how investigators have been able to relate it to the investigation.

30. Within the iCloud return belonging to LEWIS a text message conversation between LEWIS and the contact name "Zap" who was determined to be LEWIS's sister, Nashiba N. Radcliff. The conversation which began on 10/4/2019 through 4/23/21 shows Nashiba Radcliff's involvement in LEWIS's DTO and her assistance with movement of cash,

14

drugs, renting properties, paying for the rented properties, and offers insight into Deshawn LEWIS's operation.

31.    Nashiba Radcliff chats with LEWIS on prices of prescription drugs, methamphetamine and selling the drugs. Nashiba Radcliff and LEWIS have a conversation about a package which was supposed to be delivered to Nashiba Radcliff's residence at 875 Chittenden Avenue Columbus, OH 43201. The conversation details how the package was never delivered, and they believed the mailman may have stolen the package. Nashiba Radcliff submitted a claim to have the package redelivered and LEWIS cautions her not to touch it and he will have a "geek" come over to get it. Investigators know the term "geek" to be used to describe narcotics users.

32.    Based on training and experience your affiant knows drug dealers commonly receive narcotics through the mail system and will pay individuals to accept the packages, often times paying other individuals to retrieve the packages from the final destination.

33.    LEWIS directs Nashiba Radcliff to collect and send cash on numerous occasions. LEWIS directs Nashiba Radcliff to get money and provides the address of 307 N. Taylor Avenue, Columbus, Ohio 43203. LEWIS tells Nashiba Radcliff he has a person who is going to drive a truck belonging to Deshawn LEWIS to him. LEWIS asks Nashiba Radcliff if he can meet this person on "5th" and "give him the money." Nashiba responds with a series of videos showing her loading what appears to be a large amount of cash into a Bath and Body Works box and then wrapping the box with Christmas wrapping paper. LEWIS tells Nashiba Radcliff that

15

"Rio" is trying to "drop that money" and then later confirms Nashiba Radcliff "got it." "Rio" has been identified as Mario Sydnor Sr.

34.    Nashiba Radcliff chats with Deshawn LEWIS about several rental properties, which include 442 South Yale Avenue, accounts with the name Amanda Keener and Ryan Gregory. Amanda Keener is an identity that investigators believe LEWIS uses in an attempt to distance himself from the rentals. Nashiba Radcliff mentions "Shasta" as the rental agent she uses to rent and maintain the properties. "Shasta" has been identified as Shasta Long and works for Heart and Home Property Management. There are numerous screenshots between Deshawn LEWIS and Nashiba Radcliff which shows Deshawn LEWIS sending money through cash app to pay for the rent on 442 South Yale Avenue under the name of Amanda Keener and conversations about LEWIS paying rent on other properties as well.

35.    Nashiba Radcliff also appears to utilize the banking system and cash sending applications such as Zelle. Nashiba Radcliff sent a video to Deshawn LEWIS of her in what appears to be a bank drive thru and the video shows a large amount of cash in the vehicle. Nashiba sends several screenshots of the Zelle app where she is sending money to "Deshawn Lemar." The screenshots show multiple transactions which total to $6,901 and $15,601.

36.    James Haley has been identified by investigators and confidential sources as another member of LEWIS's DTO. Investigators have identified the phone number of 614-852-1538 as the phone number belonging to James Haley. Contained within the iCloud search warrant belonging to LEWIS are text messages between LEWIS and Haley. Below is a summary of the conversation between 9/26/2020 and 2/10/2021:

16

37.     LEWIS sends James Haley messages where he instructs James Haley to take "Rio" (Mario Sydnor Sr.) his money or "bread." LEWIS also instructs James Haley to take "12 more yams of that food" to "Rio" (Mario Sydnor Sr.). The terms "yams" and "food" are common slang terms referring to narcotics. James Haley also sends LEWIS several text messages where he gives LEWIS what appears to be drug counts and talking about where he picked up money and dropped off drugs.

38.     Based on training and experience your Affiant believes the text messages between James Haley and LEWIS show LEWIS directing James Haley to deliver his money to Mario Sydnor Sr. and other directions of drug trafficking.

39.     Since on or about July 10,2021 a GPS tracking device has been on James HALEY's Kia Optima investigators have observed his data shows him to travel to the area of Taylor Avenue and Granville Street in Columbus, OH on multiple occasions. Within the iCloud return belonging to Deshawn LEWIS, multiple pictures were geotagged to the location of 307 N. Taylor Avenue, Apt A Columbus, Ohio 43203, which is in the direct area where James HALEY's GPS showed him to be.

40.     One picture obtained from the iCloud which was captured on 11/24/2020, showed a picture of a work order for the address of 307 N. Taylor Avenue, Apt A Columbus, Ohio 43203. The name on the work order was observed to be an Amanda Keener with a phone number of 614-772-6362. Investigators further discovered a picture of a social security card with the name Amanda Keener within the media files of the iCloud belonging to LEWIS.

17

41.     A search was completed through a law enforcement database showed Amanda Keener to have a possible address of the 307 N. Taylor Avenue, Apt A Columbus, Ohio 43203 and showed active utilities to be in her name at that location. Based on training and experience your Affiant knows that drug dealers commonly will rent properties in fraudulent names or names of drug customers in order to better conceal their narcotics trafficking locations.

42.     Contained within the iCloud account belonging to LEWIS were text messages between himself and Mario Sydnor Sr. (Big Rio). Mario Sydnor Sr. phone number is identified as 614-589-0551. The following is a summary of the text message conversation between Mario Sydnor Sr. and LEWIS between the dates of 8/29/20 to 4/19/21.

43.     LEWIS and Mario Sydnor Sr. have numerous conversations regarding money. LEWIS instructs Mario Sydnor Sr. to facetime the number 614-971-0717 to pick up "bread". In LEWIS's iCloud account, the number belongs to the name "Staccs Shadudy," who has been identified as Micaiah Harris DOB 7/1/1997. The conversations between LEWIS and Micaiah Harris talk about "the count" and "Rio" getting the same "count." Your Affiant knows through training and experience, the term "the count" is often used a slang terminology referring to narcotics trafficking. LEWIS also sends a video to Mario Sydnor Sr. where LEWIS has several large stacks of money. The third stack of money, LEWIS says "thirty-six hundred, two zips." Your Affiant knows from training and experience, the term "zip" is a slang term often used to describe an ounce of narcotics.

44.     Several times throughout the text message thread Mario Sydnor Sr. commonly tells LEWIS to Facetime him and reminds LEWIS not to text. Your Affiant knows from training

18

and experience drug dealers commonly will communicate through Facetime or phone calls to better conceal illegal activity.

45.     A subpoena was sent to Ring on September 14, 2021, for the account associated with the 307 N. Taylor Avenue, Apt A Columbus, Ohio 43203.  Ring returned the subpoena with the Ring doorbell subscriber information with the name "Jon Doe" with an email address of Cripface4454@icloud.com, which investigators know belongs to LEWIS.

46.     On August 28, 2021, at approximately 1:30 p.m., investigators were conducting surveillance on 307 N. Taylor Avenue, Apt A Columbus, Ohio 43203.  At approximately 2:36 p.m., the investigators observed a male matching the description of LEWIS exit from the rear of 307 N. Taylor Avenue, Apt A Columbus, Ohio 43203 and enter a white Toyota Corolla with Texas tag PNF-4067. An unknown male was observed entering the passenger side of the vehicle as well.  Investigators followed the vehicle to the area of 920 Caldwell Place Columbus, Ohio 43203.  Investigators continued surveillance in the area until approximately 3:45 p.m., when the same male who was positively identified as LEWIS was observed exiting 920 Caldwell Place and entering the aforementioned white Toyota Corolla.

47.     On August 30th, 2021, investigators conducted surveillance on LEWIS.  At approximately 10:00 a.m., LEWIS's rental vehicle, the white Toyota Corolla, was observed parked in front of 920 Caldwell Place Columbus, OH 43203.  At 12:08 p.m., LEWIS was seen exiting 920 Caldwell Place Columbus, OH 43203, with a male later identified as Marquis Anderson.

19

48.     Investigators followed LEWIS upon leaving 920 Caldwell Place Columbus, OH 43203, where he was observed driving directly to 307 N. Taylor Avenue, Apt A Columbus, Ohio 43203.  LEWIS was observed standing at the rear door of 307 N. Taylor Avenue, Apt A Columbus, Ohio 43203 for several minutes talking on his cell phone.  At approximately 12:38 p.m., a white GMC Yukon was observed pulling into the rear parking lot of the residence.  A male, later identified as Mario Sydnor Sr., was observed walking from the GMC Yukon and entering the residence with LEWIS.

49.     Investigators conducting surveillance on or about September 20, 2021, observed SYDNOR Sr. exit a vehicle and entered 307 N. Taylor Avenue, Apt A Columbus, Ohio 43203. Investigators observed that SYDNOR entered 307 N. Taylor Avenue, Apt A Columbus, Ohio 43203 with a book bag and a firearm in his hand.

50.     Records from a GPS installed on a vehicle know to be utilized by SYDNOR Sr. on or about September 15, 2021, show that the vehicle travels to 307 N. Taylor Avenue, Apt A Columbus, Ohio 43203 on a regular basis. The vehicle will stay for several hours at a time. Investigators conducting surveillance during times SYDNOR Sr. is known to be at 307 N. Taylor Avenue, Apt A Columbus, Ohio 43203 observe foot and vehicle traffic that they know from training and experience is consistent with narcotics trafficking.

51.     Investigators know through electronic and physical surveillance that SYDNOR Sr. resides at 808 Gascony Drive, Reynoldsburg, Ohio.

52.     On October 7, 2021, a trash pull was conducted at 808 Gascony Avenue. Investigators found two kilo wrappers marked with the name Casper. These wrappers match the wrapper recovered from 307 N. Taylor Avenue, Apt A Columbus, Ohio 43203.

53.     On or about October 21, 2021, Columbus Police Narcotics Unit conducted a controlled purchase of narcotics from 214 S. Yale Avenue Columbus, Ohio 43222. On or about October 21, 2021, a search warrant was executed at 214 S. Yale Avenue, Columbus Ohio 43222. The suspected narcotics purchased was tested and tested positive for cocaine. Investigators using physical and electronic surveillance had observed LEWIS at the location days prior to the execution of the search warrant. On the day of the search warrant investigators on surveillance observed LEWIS enter 214 S Yale Avenue At the time of the search warrant LEWIS was not present. Investigators found approximately 5 grams of suspected crack cocaine, 2.5 grams of suspected fentanyl, and $500 in US currency. Investigators found a box of clothing from the Trap House Apparel clothing line. The box included t-shirts, hats and sweatshirts. On the sleeves of a sweatshirt were the words "Cuttboy Crippy". Investigators have observed a social media post by LEWIS displaying the exact same sweatshirt that investigators found in the home. Investigators interviewed the occupants of 214 S. Yale Avenue Investigators were told by multiple occupants that the location was used to sell narcotics. Investigators were told that "Crippy" supplied the location and that it was his house. After the execution of the search warrant and law enforcement had left 214 S. Yale Avenue electronic surveillance placed LEWIS returning to the area of 214 S. Yale Avenue.

21

54.    On or about September 20, 2021, investigators received records from T-Mobile for phone number (614) 974-4488. Records for the account showed that the subscriber was Deshawn LEWIS with an activation date was 04/26/2021.

55.    A prior search warrant for location data associated with this number was executed from on or about October 7, 2021, to November 5, 2021. Investigators were able to confirm that LEWIS was physically in the vicinity of the phone's location on multiple occasions.

56.    On or about November 8, 2021, uniformed CPD officers were dispatched to an Airbnb located at 212 W. 3rd Avenue Columbus, Ohio. Private security had called to report an argument was occurring at 212 W. 3rd Avenue. Once at scene officers observed a broken window. Outside the window officers found shell casings. Officers checked the residence, and no occupants were found. Inside the residence officers found bullet fragments. Offices also found marijuana, unknown pills, other suspected narcotics. Offices were advised that the residence was rented by LEWIS.

57.    On or about November 21, 2021, investigators were aware that a person referred to hereinafter as CS8 had flown from Columbus, Ohio to Houston, Texas. Electronic surveillance showed CS8 leaving the airport. At the same time electronic surveillance placed LEWIS at 2403 Snowy Egret Dr., Katy, Texas. Investigators using electronic surveillance, police reports, and geotagged photos from LEWIS's iCloud believe 2403 Snowy Egret Dr., Katy, Texas to be LEWIS's residence in Texas. Electronic surveillance shows that LEWIS left the vicinity of 2403 Snowy Egret Dr., Katy, Texas and was near the Westpark Tollway at approximately 3:15 p.m. Electronic surveillance places LEWIS moving east towards Houston

22

from 2403 Snowy Egret Dr., Katy Texas. At Approximately 4:00 p.m. LEWIS is in the vicinity of Bailey Street and Victor Street in Houston, Texas. Electronic surveillance places CS8 in the same vicinity as LEWIS at the same time. A search on MapQuest shows that it would take approximately 46 mins to drive from 2403 Snowy Egret Dr., Katy, Texas to the area of Bailey Street and Victor Street.

     58.     Electronic surveillance then placed CS8 at Houston, Texas Airport. Investigators were aware that a late flight was departing Houston, Texas and arriving in Columbus, Ohio. Investigators conducting surveillance at the Columbus, Ohio airport observed CS8 return from Houston, Texas to Columbus, Ohio. Investigators followed CS8 from the Columbus Airport and a traffic stop was conducted. A police K-9 unit was deployed and alerted on the vehicle being driven by CS8. During a search of the vehicle investigators found approximately 3,538 suspected Oxycodone 30 pills. CS8 was read his rights and agreed to speak with investigators. CS8 stated that 250 of the pills belonged to him/her while the rest belonged to LEWIS. CS8 stated he/she had obtained the pills from Lewis in Houston, Texas. CS8 stated that they had made multiple prior trips to bring pills from Texas to Columbus, Ohio for LEWIS. CS8 stated that they had previously delivered the pills to LEWIS at Airbnb's in the Columbus, Ohio area. Investigators using physical surveillance have observed LEWIS and CS8 meeting in Columbus, Ohio in the past.

     59.     A search of CS8's phone showed multiple relevant texts related to the investigation. On or about November 19, 2021, the number 614–893-7860 which is listed in the contacts as Cripcrip texted "bro I aint even gon lie you need to get down here". On or about

23





61.     While the bin that the trash is removed from is a communal trash receptacle, investigators have found mail with 307 N. Taylor Avenue, Apt A. Columbus, Ohio address, have observed SYDNOR SR placing trash into the receptacle, and through surveillance know that residents of the 307 N. Taylor Avenue, Apt. A Columbus, Ohio use black trash bags which is the

color that has been removed from by investigators. Investigators removed white trash bags and found evidence that the bags belonged to Apt. C.

62.     Between October 7, 2021, and November 4, 2021, trash pulls were conducted at 808 Gascony Dr. Reynoldsburg, Ohio 43068. Investigators using electronic and physical surveillance believe this to be the home of SYDNOR Sr. Investigators found kilo wrappers marked with the name "Casper", mail addressed to SYDNOR with 808 Gascony Dr. Reynoldsburg Ohio 43068 listed, and mail addressed to Matthew Davis at 307 N. Taylor Avenue Columbus, Ohio were found in the 808 Gascony Dr trash. The wrappers are pictured below.



### FINANCIAL ACTIVITY

63.     Records received from the Ohio Department of Taxation show that LEWIS and SDYNOR Sr and Erica GRANT have not filed personal income returns for 2017-2020 nor have

26

they filed any business taxes from 2017-2020. Investigators believe GRANT to be the girlfriend of LEWIS and that she assists him in laundering his drug proceeds.

64.     From on or about March 1, 2020, to September 24, 2021, a bank account belonging LEWIS had approximately $92,351.81 in Apple, Cash App, Zelle deposits, and $35,777.73 in cash deposits.

65.     From on or about September 2018, to May 2021 a separate bank account belonging to LEWIS had approximately $61,296 in various cash deposits. From July 2020 to April 2021 this account had approximately $27,684 in PUA benefits deposited into it.

## CONCLUSION

66.     I submit that this affidavit supports probable cause for a warrant to search the safe deposit box described in Attachment A and seize the items described in Attachment B.

## REQUEST FOR SEALING

67.     It is respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the application and search warrant.  I believe that sealing this document is necessary because the items and information to be seized are relevant to an ongoing investigation into the criminal organizations as not all of the targets of this investigation will be searched at this time.  Based upon my training and experience, I have learned that online criminals actively search for criminal affidavits and search warrants via the Internet and disseminate them to other online criminals as they deem appropriate, i.e., post them publicly online through the carding forums.  Premature

disclosure of the contents of this affidavit and related documents may have a significant and

negative impact on the continuing investigation and may severely jeopardize its effectiveness.

Respectfully submitted,

Samuel Chappell
Task Force Officer, ATF

Subscribed and sworn to before me this 7 day of December 2021.

UNITED STATES MAGISTRATE JUDGE
CHELSEY M. VASCURA

28

## ATTACHMENT A
*Property to be searched*

The place to be searched is the safe deposit box #3 located in the Chase Bank at 2475 South Hamilton Rd Columbus, Ohio 43232

## ATTACHMENT B
*Property to be seized*

1.      Cash, currency, jewelry, precious metals, currency counters, financial instruments, documents and records relating to controlled substances, expenditure of proceeds of drug transactions, fraud and evidence of financial transactions relating to obtaining, transferring, secreting, or spending of large sums of money made from engaging in drug trafficking; all records relating to violations of Title 18, United States Code Sections: 1956 (Money Laundering), 1343 (Wire Fraud), and Title 21, United States Code, Section 841 (Distribution of Controlled Substance), those violations involving LEWIS and occurring after January 2017.